In the Matter of Proving the Last Will and Testament of AMELIA GERTRUDE CUTTER, Deceased, as a Will of Real and Personal Property.

W. McMASTER MILLS and GEORGE RAMSEY, Appellants; KATE LANG and Others, Respondents.

First Department, December 29, 1916.

Decedent's estate — will — probate — undue influence — evidence — burden of proof — reversal of decree refusing probate — new trial.

Proceeding for the probate of a will. Evidence examined, and *held*, insufficient to establish undue influence or a conspiracy in procuring the execution of the will.

The burden of proving undue influence in the execution of a will is upon the contestants.

Where a decree of the Surrogate's Court denying a petition for the probate of an alleged will is reversed and a new trial by a jury ordered, and the proceeding was commenced prior to September 1, 1914, the new trial should be directed to be held in the Supreme Court.

APPEAL by W. McMaster Mills and another, proponents, from a decree of the Surrogate's Court of the county of New York, entered in the office of said Surrogate's Court on the 28th day of June, 1915, denying their petition to admit to pro-

bate a paper dated the 21st day of March, 1914, and alleged to be the last will and testament of Amelia Gertrude Cutter, deceased.

*Morgan J. O'Brien,* for the appellants Mills and Ramsey.

*J. Mayhew Wainwright* and *John W. Farquhar,* for the appellants American Society for the Prevention of Cruelty to Animals and the New York Society for the Prevention of Cruelty to Children.

*Henry W. Taft,* for the respondents Cutter and others.

*Frederick C. Tanner,* for the respondents Flagg and others.

PAGE, J.:

Henry T. Cutter, the decedent's husband, died January 20, 1914, at the age of eighty-four years, and Amelia Gertrude Cutter died on April 3, 1914, at the age of seventy-three years.

They were a devoted couple and had lived in the closest and most harmonious relations during all their lives. He had been a stockholder and associated in the management of the corporation of Hegeman & Co., and had accumulated a fortune, to the extent that their combined estates amount to about $1,500,000.

In the early part of their married lives they lived in a manner in keeping with their means, though not extravagantly nor ostentatiously; kept a servant, a coachman, a carriage and a span of horses; attended the opera and theatres, entertained friends and mingled in society. During the latter part of their lives they developed penuriousness and miserliness to a marked degree, living in three rooms on the second floor of the house, in a condition of dirt and squalor. They had no servants except a man, of intemperate habits, who looked after the furnace; did some of the family washing and a minimum amount of cleaning in the unoccupied portion of the house. They refused to have a nurse or go to a hospital, although both were suffering from painful, incurable diseases that should have had skilled attention. The picture of the last months of their lives is exceedingly disgusting. But these

things in and of themselves do not show a lack of testamentary capacity. The testimony of witnesses that were hostile and whose interest because of legacies given in a former will and omitted from or substantially reduced in the one under consideration, show Mrs. Cutter to be a woman of strong will, difficult to influence, and capable of and transacting business up to nearly the last day of her life. A careful reading of the record and the history of decedent's testamentary disposition, beginning with the first will in evidence made in 1902, demonstrates to our minds clearly that she had a sound mind and disposing memory.

In 1902 Mrs. Cutter made a will of the briefest character in which she bequeathed all her property to her husband if he should survive her and in case of his death she divided it into two equal parts, one portion of which she gave to the sister of her husband, Mrs. Welsh, and if not then living then unto her children, and the other portion to the children of Stephen E. Cutter, to be equally divided between them and named her husband as her executor. On the 15th day of August, 1913, her husband made a will under which he left everything to his wife if she should survive him, and in the event that she should not survive him he made the following bequests: (a) To W. McMaster Mills, $100,000; (b) to Ernst H. Cook, $10,000; (c) to Charles W. Parsons, $10,000; (d) to children of his brother Stephen Cutter and of his deceased sister, Mrs. Welsh, each $20,000; (e) to his daughter Annie F. Cutter, from whom he had not heard for forty years, in the event of her living, $100,000; (f) to George Ramsey, $200,000; (g) to Frank M. Tichenor, $500,000; (h) to Jacob Greenfeld, $1,000; (i) to Newburyport, Massachusetts, $50,000; (j) to Mrs. Parker, $50,000; (k) to the Hospital for Deformities and Joint Diseases, $10,000; (l) To Dr. Bradner, $15,000; (m) to the Presbyterian Hospital, $20,000; (n) to the Mount Vernon Hospital, $20,000; (o) to the Methodist Episcopal Hospital of Brooklyn, $20,000; (p) to the Society for the Prevention of Cruelty to Animals; $20,000; (q) to the Society for the Prevention of Cruelty to Children, $20,000; (r) to the Methodist Episcopal Home for the Aged, $25,000; (s) all the rest, residue and remainder to his daughter Annie F. Cutter if she is living at

the time of his decease, and to his aforesaid surviving nephews and nieces, share and share alike, in the event that his said daughter is not living at the time of his decease, and he named his wife and Frank M. Tichenor executors.

On the 20th day of August, 1913, Mrs. Cutter made her will in which she first bequeathed "to my domestic servant, Mary Campbell, in the event that she is in my employ at the time of my decease and not otherwise, the sum of Five hundred dollars ($500); I give and bequeath to my dressmaker, Loretta McLaughlin, the sum of One thousand dollars ($1,000); but these two legacies shall not be paid in any event if my husband survives me unless he consents to such payment, in writing."

Then she devised all her real and personal property to her husband if he should survive her. Then she says: "*Fourth.* My beloved husband, Henry T. Cutter, with my full knowledge and approval of its contents, duly made and published his Last Will and Testament on the fifteenth day of August, 1913, under the terms of which will, in the event that I survive my said husband and not otherwise, all his property both real and personal is given, devised and bequeathed to me, and in the other event that I do not survive him, his said property is thereby given, devised and bequeathed to various persons, devisees and legatees thereunder, as will more particularly appear, upon an examination of the said will of Henry T. Cutter, dated August 15th, 1913. It is the wish of my said husband and it is also my wish that, in the event that I survive my said husband, and in the event that the provision made for me in his said will of August 15th, 1913, becomes effective, the real and personal property of which I may die seized and possessed (exclusive of the money necessary to pay the legacies of Mary Campbell and Loretta McLaughlin, as hereinbefore provided) shall be disposed of as follows, and in the aforesaid two events I do hereby give, devise and bequeath all my property both real and personal as follows, that is to say: "

And she followed precisely the same letters of the alphabet and made the identical bequests as in her husband's will, and made her husband and Frank M. Tichenor her executors. The men to whom he and she gave so much money, Mills and Ramsey, were old and intimate personal friends, one of them,

App. Div.]        First Department, December, 1916.

Ramsey, being a business associate, and the other, Tichenor, their legal adviser.

On the eleventh of March, her husband having died in January, she made another will, which was drawn by Messmore Kendall, she having requested Dr. Frauenthal to send her an attorney because for some time she had been dissatisfied with some of the provisions of her will of August 20, 1913, and had asked Mr. Ramsey, her husband's oldest and best friend, already one of the legatees named in her will, to send up an attorney to make the changes, but he had neglected it. Dr. Frauenthal suggested about ten lawyers. But she finally secured Mr. Kendall and this will was executed on March eleventh. She omitted therein the two small legacies to the servants because neither of them was then with her, but paragraphs second, third, fourth and fifth are precisely the same as paragraphs a, b, c and d of the 1913 will. She dropped out the $100,000 bequest to the daughter Annie F. Cutter, from whom they had not heard in forty years in 1913, being satisfied that she was dead. The sixth paragraph is the same as f, that is $200,000 to Ramsey. By the seventh paragraph she cut down the legacy to Tichenor from $500,000 to $50,000, she having said that was about one-third of her estate, which was true, and that it was altogether too much, and she was not satisfied with leaving him so much, but she did leave him $50,000. The eighth and ninth are the same as h and i. She cut out the bequest to her friend Mrs. Parker upon the ground that she had plenty of money and did not need it, and in the tenth paragraph she inserted a gift of $50,000 to her niece Charlotte Cutter, and by the eleventh paragraph gave to each of the descendants of the late Annie F. Cutter *per stirpes* the sum of $5,000, and in the twelfth "to each of my next of kin" the sum of $1,000. Instead of the bequest of $10,000 to the Hospital for Deformities and Joint Diseases she made that concern her residuary legatee. The thirteenth to Dr. Bradner, $15,000, is the same as l, and she gave to Dr. Frauenthal, who was at the head of the Hospital of Deformities and Joint Diseases a personal legacy of $15,000 in addition, as above stated, to making the hospital the residuary legatee. The fifteenth was the same as m, the sixteenth the same as n, seventeenth the same as o, eighteenth the same as p,

First Department, December, 1916.          [Vol. 175.

nineteenth the same as q, twentieth the same as r, and she named as her executors her friends George Ramsey, W. McMaster Mills and her friend and legal adviser, Messmore Kendall.

The only difference between the wills of March eleventh and March twenty-first were the following: In that of March eleventh there was a bequest of $1,000 " to each of my next of kin " that was omitted in that of March twenty-first. In that of March eleventh the Hospital for Deformities and Joint Diseases was residuary legatee, and in that of March twenty-first there was a specific legacy of $25,000 to this hospital, and the residue was left to her executors " to be by them applied in their best judgment and discretion to such charitable and benevolent institutions as my said executors may select and in such sums respectively as they may deem proper." She having concluded that as both she and her husband had been of the opinion that they should distribute their charities instead of giving all to one institution and having said that she did not know about the different charities accomplished that purpose by leaving the selection to her executors, in whom she had confidence, and finally in the will of March eleventh Ramsey, Mills and Kendall had been named as executors, and in that of March twenty-first Kendall was dropped. All the other specific bequests were the same. Thus it clearly appears that she had the same general testamentary scheme in mind from August, 1913, when she and her husband practically made joint wills down to and including this last will of March twenty-first, and the people who are now accused of having entered into a conspiracy to dispose of her property received precisely the same amounts in all of those wills, the only person who was cut down being Tichenor from $500,000 to $50,000 for reasons which she expressed. A charge of undue influence and a conspiracy based upon such a testamentary record would have to be supported by the strongest kind of evidence. There is no evidence to support it and the court below fell into the legal error of placing the burden of proving that there was no undue influence upon the proponents while the law requires that undue influence must be established by the contestants. (*Matter of Kindberg*, 207 N. Y. 220, 228.) The evidence establishes that the will was her's and that she was competent to make it

and that there was nothing done which she did not wish and direct. The decree of the surrogate should be reversed, with costs to all the appellants who have appeared and filed briefs in this court payable out of the estate.

Having decided to reverse the decree of the surrogate on questions of fact there must be a new trial by a jury of the material questions of fact arising upon the issues between the parties. (*Matter of Drake,* 45 App. Div. 206; Code Civ. Proc. § 2588, as it existed prior to September 1, 1914.) This proceeding was commenced prior to September 1, 1914; the law as it existed at that date is applicable (Code Civ. Proc. § 2771, added by Laws of 1914, chap. 443, as amd. by Laws of 1915, chap. 274). Therefore, the new trial will be directed to be had at a Trial Term of the Supreme Court held in and for the county of New York. Let the order which must state distinctly and plainly the questions of fact to be tried be settled on notice.

CLARKE, P. J., McLAUGHLIN, SCOTT and SMITH, JJ., concurred.

Decree reversed, with costs, and new trial ordered as stated in opinion. Order to be settled on notice.